Filed 7/9/24  P. v. Ramos CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESUS RAMOS,<br><br>    Defendant and Appellant. | F085003<br><br>(Super. Ct. No. 98M28905B)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Madera County.  Dale J. Blea, Judge.

Robert L. Hernandez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Petitioner Jesus Ramos petitioned the superior court, pursuant to former section 1170.95 (now § 1172.6) of the Penal Code,[1] for resentencing on his conviction for first degree murder (§ 187). The superior court conducted an evidentiary hearing and denied the petition after finding beyond a reasonable doubt that petitioner was a major participant in the underlying felony who acted with reckless indifference to human life, and also aided and abetted in the murder with intent to kill.

On appeal, petitioner contends substantial evidence does not support the trial court's findings, and the court abused its discretion in failing to consider petitioner's youth at the time of the offense in determining whether he was eligible for relief.

We affirm.

# FACTUAL BACKGROUND

Our factual summary is taken from the transcript of the preliminary hearing for petitioner and his two codefendants, Juan Vargas and Rogelio Morales, Jr.

On December 28, 1997, at approximately 7:51 a.m., Madera County Sheriff's Deputy M. Schafer was dispatched regarding a suspicious vehicle in an orchard. Dispatch advised that the vehicle was seen in the orchard with the vehicle running and the lights on, but no suspects were in the area. Schafer arrived at the designated location approximately five to 10 minutes after being dispatched, and he saw a 1990 blue Buick Regal parked 20 to 30 meters into the orchard. The engine was running, the keys were in the ignition, and all exterior lights, including the headlights, were on. The heater was on and the interior of the car was excessively hot, indicating the heater had been running for a long time. Inside the vehicle and/or trunk, Schafer found a ceiling fan in its original box, a shopping cart, a Kodak camera still in its case, and a red umbrella.

---

[1] Undesignated statutory references are to the Penal Code. Former section 1170.95 has been renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We refer to the current section 1172.6 in this opinion.

Schafer ran the car's license plate through dispatch, and dispatch advised that the car was registered to Elizabeth Martinez. Dispatch advised Schafer of Martinez's address in the 200 block of High Street in the City of Madera. Schafer advised dispatch to send a Madera police officer to the residence to contact Martinez and find out why her car was in the orchard.

Madera Police Officer W. Webb was dispatched to Martinez's residence at approximately 8:30 a.m. Webb rang the doorbell and knocked on the door several times, but no one responded. Webb left a note for Martinez, advising her to contact the police department regarding her car. Dispatch advised Schafer that the officer was unable to contact Martinez because no one answered the door at her residence.

Around 2:20 p.m. that same day, Schafer went to Martinez's residence and attempted to contact her. He knocked on the door several times but received no answer. All the shades on the windows were closed, so he could not see inside the residence. Schafer left his business card on the front door with a message on the back for Martinez to contact the sheriff's office regarding her car. Schafer also observed a Madera police officer's business card on the front door. Schafer then advised dispatch to send a tow truck out to tow Martinez's vehicle.

On January 2, 1998, at approximately 8:09 a.m., Webb was dispatched to Martinez's residence to conduct a welfare check. Webb had received information that Martinez's friend was concerned about Martinez's well-being because she had not been answering her door. When Webb arrived at the residence, he spoke with Martinez's friend who said she had not been able to contact Martinez. She also handed Webb the note that he had left on Martinez's door and Schafer's business card that had also been left on the door.

The front of the residence did not show any signs of forced entry. Webb jumped over the fence into the backyard and saw that glass on the back sliding door was broken. Webb advised dispatch of the situation and Officer T. Galovich was dispatched to assist

3.

him. The officers observed that the sliding glass door was open approximately seven to eight inches, but the screen door was secured and shut. The officers pulled the screen door out of the track, opened the sliding glass door, and announced that they were police officers. Once inside the residence, the officers found the deceased body of a female between 65 and 70 years old lying on the bed under the covers. The officers advised dispatch and the watch commander of their findings and secured the scene.

Detective E. Guzman was dispatched to Martinez's residence to investigate a suspected homicide. When he arrived, officers at the scene briefed him on what they had discovered in the residence. Guzman entered the backyard of the residence and saw the broken window on the sliding glass door. He entered the residence through the sliding glass door, which led to the bedroom, where he saw a female lying face up on the bed with "some kind of a wound" to her left temple. He also saw a large red brick on the foot of the bed that matched other bricks he saw in the backyard. A few items appeared displaced within the bedroom and it appeared the room had "partially been gone through" or searched. Guzman later identified the woman as Martinez.

During his investigation, Guzman spoke with informants who provided information that led Guzman to speak with petitioner, Morales, Vargas, and L.O. Guzman conducted several interviews with these individuals and testified at length to their statements.[2]

Guzman first contacted petitioner with another individual on April 6, 1998. Guzman placed both individuals in the back of his car and recorded them on a hidden tape recorder. During that conversation, petitioner told the other individual that he and his friends had shot someone.

---

[2] The trial court did not rely on Guzman's testimony regarding the statements of others in determining petitioner is ineligible for resentencing. Outside of the preliminary hearing context, this testimony appears to be hearsay without an exception. Accordingly, we do not summarize it. (See § 1172.6, subd. (d)(3).)

Guzman drove petitioner and the other individual to the police department for interviews. Petitioner initially told Guzman he had heard some things about the shooting. Petitioner told Guzman that he encountered Vargas at school and Vargas personally told petitioner that he and some friends had gone to a house and, when they arrived, a woman there started shooting at them and Vargas shot her.

After the interviews, Guzman returned petitioner and the other individual to the police car, where they again were recorded discussing the shooting.

On April 9, 1998, Guzman arranged for L.O. to make a pretext phone call to petitioner. During the phone call, petitioner stated that Vargas was the shooter and L.O., Morales, and petitioner were involved in the home invasion.

On April 10, 1998, Guzman contacted petitioner for another interview. Petitioner told Guzman that he, Morales,[3] Vargas, and L.O. were together at the scene of the homicide. The group had been together that evening and discussed places to burglarize. L.O. suggested a victim (not Martinez who ultimately was shot) and also suggested driving around to find someone to burglarize. The group drove around in Morales's car, eventually ending up at Martinez's house.

Petitioner told Guzman they visited Martinez's house three times on the night of the shooting. On the first occasion, they drove to the front of the house and saw that the lights were out and assumed no one was home. They parked around the corner and petitioner, Vargas, and L.O. exited the vehicle and walked down an alleyway behind Martinez's home. Petitioner and Vargas jumped the fence and, in doing so, made a noise. Martinez looked out the window, but petitioner and Vargas stood still and were not seen. When Martinez turned away, petitioner and Vargas jumped back over the fence and ran back to the car, eventually returning to Morales's house.

---

[3] Petitioner told Guzman this person was named "Fieretos." Guzman later determined Fieretos was Morales.

They remained at Morales's house for a while before returning to Martinez's house. Morales parked in the same location as before and stayed in the car. Petitioner, Vargas, and L.O. went back down the alley and all three jumped the fence. Vargas was armed with a gun. The plan was to break the window, but no one wanted to do it. Eventually, petitioner told Vargas to give him the gun and handed Vargas a brick from the rear fence. Vargas told petitioner to break the window so petitioner took the brick back and gave Vargas the gun. Petitioner threw the brick through the window, breaking the window. It made a sound like gunshots, and they thought Martinez was shooting at them. Martinez started screaming. Vargas shot the gun at her two or three times. Martinez continued screaming for approximately two seconds. Petitioner was standing behind Vargas to his left when the gun was fired. The group then ran back to the car and returned to Morales's house.

On the third visit to Martinez's house, L.O. stayed in the car while Morales, Vargas, and petitioner went through the alley, into Martinez's backyard, and eventually into her home. Vargas had a flashlight and shined it on Martinez in her bed as they walked into the bedroom through the broken window. They went through the home and stole several items, including a stereo, a .22-rifle, a "BB gun type rifle," and a jewelry box. Morales retrieved Martinez's keys and Vargas used them to start her car. They drove Martinez's car out of the garage and to Morales's vehicle. Morales and L.O. got into Morales's vehicle while petitioner and Vargas stayed in Martinez's vehicle. They all drove to a field where they left Martinez's car.

The group later tried to sell the jewelry box before tossing it on the side of the road. Petitioner told Guzman that he believed the rifle and BB gun were sold but he did not know who they were sold to.

## PROCEDURAL HISTORY

On February 2, 1999, the Madera County District Attorney filed a first amended information charging Morales, Vargas, and petitioner with the following offenses: first

degree murder (§ 187, subd. (a); count one) with the special circumstance that the murder was perpetrated during the commission of robbery and burglary (§ 190.2, subd. (a)(17)); first degree robbery (§ 211; count two); first degree burglary (§§ 459 & 462, subd. (a)); count three); assault with a firearm (§ 245, subd. (a)(2); count four); unlawful taking or driving a motor vehicle (Veh. Code, § 10851, subd. (a); count five); and grand theft (§ 487, subd. (a); count six). As to counts two through four, the information alleged Vargas personally inflicted great bodily injury on an elderly victim (§ 12022.7, subd. (c)). As to counts one through four, the information alleged (a) the offenses were committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)); (b) Vargas personally used a firearm (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)); (c) petitioner furnished a firearm to another for purposes of aiding, abetting or enabling the commission of a felony (§ 12022.4); (d) petitioner and Vargas carried a firearm on their persons or in a vehicle (§ 12021.5, subd. (a)); and (e) all three defendants were principals armed with a firearm (§ 12022, subd. (a)(1)).

At some point, the gang enhancement allegations were stricken. On February 11, 1999, petitioner entered a plea[4] of either guilty or no contest to all counts in the information and admitted the enhancements for furnishing a firearm, carrying a firearm on his person or in a vehicle, and being a principal armed with a firearm. The special circumstance allegations were dismissed. The trial court sentenced petitioner to an aggregate term of 25 years to life plus 14 years, 8 months.

---

[4] A transcript of the change of plea colloquy is not contained in the record on appeal. The minutes from the change of plea hearing reflect that the court queried petitioner regarding his guilty plea. Additionally, petitioner filed a "Declaration Regarding Guilty Plea" (underlining & some capitalization omitted), memorializing his intent to plead guilty. However, the minutes state that petitioner entered a plea of no contest to the relevant charges. Ultimately, the nature of petitioner's plea is not relevant to this appeal.

On April 9, 2019, petitioner filed a petition for resentencing pursuant to section 1172.6. Briefing followed. Additionally, petitioner filed a "supplemental" petition for resentencing pursuant to section 1172.6, arguing that his brain, at the time of offense, was insufficiently developed to understand the consequences of his actions. (Capitalization omitted.) He submitted a report by Dr. Richard A. Blak, which petitioner characterized as opining that petitioner lacked capacity to form intent to kill or to act with reckless indifference to human life.[5]

The matter was heard on March 14, 2022, at which point the court determined that petitioner had established a prima facie case for relief. The court proceeded immediately to the evidentiary hearing.[6] The court took judicial notice of various documents, including the minute order from the change of plea hearing, the preliminary hearing transcript, and Blak's report. The court also took judicial notice of several documents not contained in the record on appeal: a psychological report pertaining to Vargas prepared near the time of the preliminary hearing and the probation officer's reports as to both petitioner and Vargas.

After the hearing, the parties filed posthearing briefs. The People argued the preliminary hearing, plea, medical reports, and probation reports established petitioner aided and abetted the murder and was a major participant in the offense who acted with reckless disregard for human life. In response, petitioner argued he did not aid and abet the murder with intent to kill and did not act with reckless indifference to human life.

The parties returned on August 15, 2022, and provided further argument. Defense counsel conceded there was "probably evidence" that petitioner was a major participant in the offense, but argued there was "no evidence" he acted with reckless indifference to

---

[5] We discuss the parties' arguments regarding this report in greater detail below.

[6] Although the court proceeded immediately to an evidentiary hearing, it did not issue an order to show cause until March 22, 2022, at which time it ordered the parties to appear on June 6, 2022, to show cause why petitioner should not be granted relief.

human life or that he had the intent to kill. The People argued petitioner aided and abetted the murder and was a major participant who acted with reckless disregard for human life.

The court ruled as follows:

"The preliminary hearing transcript indicates that [petitioner] admitted to Detective Guzman that he, Mr. Vargas, and others, were looking for places to burglarize. They eventually arrive at Elizabeth Martinez's house. Ultimately, they went to the house three times that night. The first time, they observed that the lights to the house were not on, and it appeared that nobody was home. [Petitioner] and Mr. Vargas jumped a fence into the back yard of the residence, causing a disturbance that startled the victim, who was, in fact home. [Petitioner] told Detective Guzman that the victim looked out her window after the noise was made. [Petitioner] and Mr. Vargas jumped back over the fence and ran back to their car and drove away.

"Later that same night, the two returned to the same residence with full knowledge that it was occupied. [Petitioner], who was carrying a firearm, and Mr. Vargas jumped the fence again to enter the victim's back yard. After entering the back yard, [petitioner] handed the gun to Mr. Vargas. [Petitioner] then threw a brick through a window of the residence, and a person inside the residence began screaming.

"They heard what sounded like gunshots and believed that the person in the house was shooting at them. [Petitioner] told Detective Guzman that Mr. Vargas shot the handgun that [petitioner] had given to him and fired two or three times. [¶] Scared the gunshots were heard by neighbors, both [petitioner] and Mr. Vargas ran back to their car and fled. . . . [Petitioner] told Detective Guzman that the two returned to the residence later that night, entered through the broken window, stole a stereo, a .22 rifle, a BB gun, and a jewelry box from the victim's bedroom.

"The statements made by [petitioner] to Detective Guzman are admissible pursuant to . . . Evidence Code Section 1220 as an admission of a party opponent exception to the hearsay rule as to [petitioner].

"As to [petitioner], on February 11th, 1999, he entered into a plea of no contest to murder and admitted that in committing the offense, he furnished a firearm to another person for the purpose of aiding, abetting, or

9.

enabling that person to commit the felony within the meaning of Penal Code Section 12022.4[, subdivision] (a).

"By, one, returning to the residence a second time knowing that there was a person inside; two, bringing a firearm with him; three, giving that firearm to Mr. Vargas; and, four, initiating the events that ultimately led to Elizabeth Martinez's murder by throwing a brick through the window of her home, [petitioner], though not the actual killer, was a major participant in the burglary of Ms. Martinez's residence. [Petitioner] acted with reckless indifference to human life knowing that in doing so, there existed a grave risk of death to the occupant of the residence, Ms. Martinez. Accordingly, [petitioner] may still be convicted of murder under Penal Code Section 189[,] subdivision (e)[,] paragraph (3).

"Further, notwithstanding [petitioner's] assertions to the contrary, he brought a loaded firearm to the residence that he intended to burglarize knowing that the residence was occupied. There would be no reason to bring a firearm to the location of the crime unless he intend[ed] it to be used by himself or one of his coconspirators to kill the occupant of the residence, if necessary, to complete the burglary. Accordingly, [petitioner] may still be convicted of murder pursuant to Penal Code Section 18[9,] subdivision (e)[,] paragraph (2)."

On that basis the section 1172.6 petition for resentencing was denied.

## DISCUSSION

## I.      Applicable Law Regarding Section 1172.6

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) "to amend the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The bill accomplished this task by adding three separate provisions to the Penal Code. (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).) First, to amend the natural and probable consequences doctrine, the bill added section 188, subdivision (a)(3), which requires a principal to act with malice aforethought before he or she may be convicted of murder. (§ 188, subd. (a)(3); accord, *Gentile*, at

10.

pp. 842–843.)  Second, to amend the felony-murder rule, the bill added section 189, subdivision (e):

> "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."[7]  (§ 189, subd. (e); accord, *Gentile, supra,* 10 Cal.5th at p. 842.)

Finally, the bill added former section 1170.95, now section 1172.6, to provide a procedure for those convicted of a qualifying offense "to seek relief under the two ameliorative provisions above."  (*Gentile, supra,* 10 Cal.5th at p. 843.)

Under section 1172.6, an offender seeking resentencing must first file a petition in the sentencing court, and the sentencing court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief.  (§ 1172.6, subds. (a)–(c); accord, *People v. Strong* (2022) 13 Cal.5th 698, 708.)  If the sentencing court determines the petitioner has made a prima facie showing, the court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction. (§ 1172.6, subds. (c), (d)(1).)

At this evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019."  (§ 1172.6, subd. (d)(3).)  "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law,

---

[7] Additionally, subdivision (f) of section 189 permits felony-murder liability under specified circumstances where the victim is a peace officer.

including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).)

"Ordinarily, a trial court's denial of a section 1172.6 petition [following an evidentiary hearing] is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ' " ' "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

## II. Sufficient Evidence of Felony-murder Liability

The trial court found petitioner was ineligible for resentencing because the prosecution had proved beyond a reasonable doubt that he was guilty of murder as a major participant in a qualifying felony who acted with reckless indifference to human life. Petitioner contends these findings are not supported by substantial evidence. We disagree.

### A. Applicable Law Regarding Felony Murder

Since the passage of Senate Bill No. 1437, section 189, subdivision (e)(3) provides that a participant in a qualifying felony where a death occurs may be liable for murder if the person was "a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." Relatedly, section 190.2 "identifies the circumstances under which murderers and accomplices can be punished by death or life imprisonment without parole. . . . For defendants who did

12.

not kill and lacked intent to kill, section 190.2, subdivision (d) permits such punishment only if they acted 'with reckless indifference to human life and as a major participant' [in] a qualifying felony like robbery." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7; see *In re Scoggins* (2020) 9 Cal.5th 667, 674 (*Scoggins*).)

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), our Supreme Court sought to clarify the circumstances under which "an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty." (*Id*. at p. 794.) The high court identified the following nonexhaustive factors as relevant to this inquiry: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.) However, "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid*.)

The following year, in *People v. Clark* (2016) 63 Cal.4th 522, 614–623 (*Clark*), the high court addressed the "reckless indifference" standard. The court explained that reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) The court further explained that reckless indifference to human life has both a subjective and an objective component. (*Ibid.*) Subjectively, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks*, *supra*, 61 Cal.4th at p. 801; accord, *Clark*, at p. 617.) Objectively, " '[t]he risk [of death] must be

of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Clark*, at p. 617.)  The fact that a felony involves a gun is insufficient, by itself, to support a finding of reckless indifference.  (*Id*. at pp. 617–618.)

In *Clark*, the high court provided the following nonexhaustive list of factors to be considered in determining whether the defendant acted with reckless indifference: (1) knowledge of weapons, and use and number of weapons; (2) physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) duration of the felony and period of interaction between the perpetrators and the victims, (4) the defendant's knowledge of his or her cohort's likelihood of killing, and (5) the defendant's efforts to minimize the risk of violence during the felony.  (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.)  Like the factors considered in *Banks*, " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, at p. 618.)

Notably, *Banks* and *Clark* derived their holdings from *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), the prevailing Eighth Amendment jurisprudence regarding the circumstances under which the death penalty permissibly may be imposed for felony murder.  (*In re Ramirez* (2019) 32 Cal.App.5th 384, 393.)  Our Supreme Court has explained that *Enmund* and *Tison* together establish a " 'spectrum of culpability,' " with felony murderers who " 'actually killed, attempted to kill, or intended to kill' " at one end, and minor actors who were not present on the scene and had no culpable mental state at the other.  (*Scoggins*, *supra*, 9 Cal.5th at p. 675.)  We briefly describe the facts of *Enmund* and *Tison* to give context to this spectrum.

The defendant in *Enmund* was a getaway driver for a robbery.  He sat waiting in his parked car a few hundred feet away from the home where his two confederates fatally shot an elderly couple when they resisted.  (*Enmund*, *supra*, 458 U.S. at p. 784.)  The

high court emphasized the defendant "did not kill or attempt to kill," and the record did not support a finding he had "any intention of participating in or facilitating a murder." (*Enmund*, at p. 798.) As such, imposition of the death penalty, which must be based solely on a defendant's own culpability, was constitutionally disproportionate. (*Ibid*.)

The facts of *Tison* are starkly different. There, two brothers helped their father and his cellmate—both convicted murderers—escape from prison, arming the prisoners during their escape. (*Tison*, *supra*, 481 U.S. at pp. 139, 150–152.) When the group eventually experienced car trouble, one of the brothers flagged down a passing car for help while the other men laid in wait by the side of the road. (*Id.* at pp. 139–140.) The group then kidnapped at gunpoint a family of four in the passing car, robbed them, and drove them into the desert. (*Id.* at p. 140.) The brothers stood by while their father and his cellmate shot the victims repeatedly. The group then left the family to die in the desert and drove off in the family's car. (*Id.* at pp. 139–141.) The high court emphasized that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." (*Id.* at pp. 157–158.) The high court noted the brothers' substantial and active participation in the kidnapping and robbery implicated them in the resulting deaths, and the death penalty could properly be imposed under such circumstances where the defendants also exhibited reckless indifference to human life. (*Id.* at p. 158.)

Our Supreme Court has explained that, "[s]omewhere between [*Tison* and *Enmund*], at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for death eligibility." (*Banks*, *supra*, 61 Cal.4th at p. 802.)

## B.    Major Participation

Petitioner contends substantial evidence does not support a finding that he was a major participant in the underlying burglary that led to Martinez's death.  We disagree.

First, as petitioner concedes, petitioner participated with his codefendants in planning the burglary that led to Martinez's death.  Although the admissible record does not indicate who initially supplied the weapon used in the offense, petitioner told Guzman that he took the firearm from Vargas while outside Martinez's residence, then handed the firearm to Vargas immediately prior to the shooting.  We acknowledge the evidence does not suggest petitioner had any prior knowledge of his coperpetrators' inclination toward lethal violence.  However, the evidence suggests petitioner was aware of increased dangers posed by the nature of this crime:  he and his codefendants fled the residence once they determined it was occupied, only to return later that night with a loaded and operable firearm.  Although the duration of the offense was brief, it is significant that petitioner was present at the scene of the killing, and his actions of providing the weapon to Vargas and throwing a brick through Martinez's window facilitated the actual murder.  Furthermore, although petitioner fled the scene with his coperpetrators immediately after the murder, he later returned to burglarize the residence while Martinez lay dead in her bed.  Thus, his conduct following the murder reflects no disapproval or disavowal of the burglary or murder.

The foregoing substantial evidence is sufficient to support the court's finding that petitioner was a major participant in the underlying burglary that led to Martinez's death.

## C.    Reckless Indifference

There is substantial overlap between the evidence supporting the court's major participation finding and its reckless indifference finding.  Again, petitioner knew of the weapon used in the murder, having handed it to the actual killer mere moments before the shooting.  He was physically present at the crime scene and, although the incident in which the shooting occurred was brief, petitioner had a prolonged opportunity to restrain

16.

the crime. Rather than returning to what he knew to be an occupied residence to commit a burglary, he could have discouraged his coparticipants from returning to this residence or could have abandoned his own participation in the crime. In this regard, petitioner made no effort to minimize the risk of violence but rather, with his coperpetrators, made choices that would increase the risk of violence, i.e., by returning to an occupied residence with a loaded and operable firearm. Although the duration of the actual felony was brief and petitioner had no apparent knowledge of his coperpetrator's likelihood of killing, his conduct is nonetheless sufficient to support the court's finding that he acted with reckless indifference to human life.

In sum, substantial evidence supports the court's finding that petitioner acted with reckless indifference to human life.[8] (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.)

## III. Evidence of Youth

Petitioner contends the order denying the petition must be reversed because the trial court did not consider petitioner's youth when determining whether he acted with reckless disregard for human life. We conclude the court properly considered and rejected petitioner's evidence regarding the effect of youth on his ability to form the requisite mens rea.[9]

### A. Additional Background

Petitioner's arguments regarding the effect of his youth on his ability to form intent to kill or act with reckless indifference to human life were a substantial part of the proceedings in the trial court.

---

[8] Because we conclude substantial evidence supports the court's finding that petitioner was a major participant in the offense who acted with reckless indifference to human life, we do not consider whether substantial evidence supports the court's alternative finding that petitioner aided and abetted in the murder with intent to kill.

[9] Petitioner was 15 years old at the time he committed the offenses.

On February 24, 2022, petitioner filed a supplemental petition for resentencing. Therein, he disputed that he acted with intent to kill or reckless indifference to human life. He argued that, because of petitioner's youth at the time of the offense, his brain was insufficiently "developed and mature relative to understanding consequences." Thus, he could not anticipate that his codefendant would overreact and shoot Martinez. In support of these contentions, he submitted a report of Dr. Blak regarding his capacity to form the requisite mens rea at the time of the offense. In the report, Blak explained that he had reviewed petitioner's probation report and a letter from mental health services relating to petitioner's attendance at "Court Day School" in 1999. He also met with petitioner on October 7, 2021. Blak opined that, at the time of the offense, petitioner did not have a "mature brain," and "failed to appreciate the consequences of the behavior around him that basically persuaded him to operate in a contagious set of behaviors." Blak further opined that petitioner's "brain was immature and he was unable to engage in thoughtful, rational modulation of his acts and behavior."

At a hearing on February 28, 2022, the parties presented argument regarding Blak's potential testimony in this matter. The court queried whether Blak's testimony would be relevant and whether youth was a relevant factor under section 1172.6. Defense counsel explained that Blak would testify petitioner lacked the mental capacity to act with reckless indifference to human life. The court suggested lack of capacity was a trial issue or "an argument under a different code section," rather than under section 1172.6. The People argued the report was not relevant. The court deferred ruling on the admissibility of Blak's report or testimony.

When the parties returned to court that afternoon, the court determined that, if intent to kill was at issue, ability to form intent would also be at issue. The People agreed that, if the matter proceeded to an evidentiary hearing, "it would be proper to make arguments concerning mental state," and evidence of petitioner's actual state of mind

would be relevant.  The court then proceeded to schedule the next hearing for a date that Blak would be available to testify.

At the start of the next hearing on March 14, 2022, the court reviewed the section 1172.6 framework, as well as the criteria under which a defendant can still be convicted of felony murder, that is, as the actual killer, as an aider and abettor who acted with intent to kill,[10] or as a major participant who acted with reckless indifference to human life. The court then opined that Blak's testimony would be more appropriate for a *Franklin*[11] hearing.  The court opined that an expert such as Blak could not opine on whether a defendant was the actual killer, aided and abetted a murder, or was a major participant in the offense.  Petitioner's counsel responded that Blak's testimony would be relevant to both intent to kill or reckless indifference, either of which was required to find petitioner guilty of murder if he was not the actual shooter.  The court then agreed that such testimony would be relevant.  The People argued such testimony would violate section 29 if Blak were to opine that petitioner did not have specific intent.

The court asked defense counsel whether Blak would testify to anything other than petitioner's specific mental state.  The court then agreed to hear Blak's testimony prior to ruling on its relevance or admissibility.  Later in the hearing, the court again queried whether Blak would testify to anything other than what was contained in his report.  If not, the court stated it would consider the report.  The court then proposed that the parties continue with the hearing and the court deferred further ruling of the admissibility of Blak's testimony and report.

Upon return to court that afternoon, defense counsel stated that Blak would not be able to state whether petitioner had specific intent to kill at the time of the offense, but

---

[10] The court initially stated a defendant could be convicted as an aider and abettor *or* as someone who acted with intent to kill.  Aiding and abetting without intent to kill is not sufficient to support a felony murder conviction.  (§ 189, subd. (e).)

[11] *People v. Franklin* (2016) 63 Cal.4th 261.

would testify generally that, given his age, he likely did not have the capacity to form that intent.  The court then determined that the arguments against admitting Blak's opinion went to weight, rather than admissibility.  Accordingly, the court admitted Blak's report into evidence.  During argument, defense counsel relied on the report to argue petitioner lacked reckless disregard for human life.  The court acknowledged it had not yet read Blak's report but stated it intended to do so now that it was part of the record.  The court then requested posthearing briefing from the parties on certain issues.

When the parties returned to court on August 15, 2022, defense counsel reiterated that petitioner was a young teen at the time of the offense with an undeveloped brain that prevented him from acting with reckless indifference.  The court did not expressly address petitioner's youth in its oral ruling denying the petition.

**B.** **Analysis**

Several cases hold that youth at the time of the offense is a relevant factor in determining whether a defendant acted with implied malice or reckless indifference to human life.  (E.g., *People v. Pittman* (2023) 96 Cal.App.5th 400, 417–418 [remand required where trial court failed to consider effect of youth on ability to form implied malice]; *People v. Jones* (2022) 86 Cal.App.5th 1076, 1091–1093 [remanded for trial court to consider youth as part of the totality of the circumstances in determining whether the petitioner was a major participant who acted with reckless indifference to human life]; *In re Moore* (2021) 68 Cal.App.5th 434, 454–455 [holding that, when considering the defendant's youth, no rational trier of fact could find that the defendant acted with reckless indifference to human life]; *People v. Harris* (2021) 60 Cal.App.5th 939, 960 [holding that factfinding following an evidentiary hearing was required to determine effect of the petitioner's youth on his awareness of dangers posed by " 'the nature of the crime, weapons used, or past experience or conduct of the other participants' "].)

In the usual case, we presume the trial court followed the law in exercising its duties and duly considered the evidence presented to it.  (*In re Julian R.* (2009) 47

Cal.4th 487, 499; *People v. Nance* (1991) 1 Cal.App.4th 1453, 1456.) Here, the evidence concerning petitioner's youth was the subject of extensive argument. Ultimately, the court determined evidence regarding petitioner's youth was admissible and relevant to petitioner's state of mind and admitted Blak's report into evidence on that basis. At the conclusion of the evidentiary hearing, the court stated its intent to read the report. Thus, although the report and petitioner's youth were not specifically mentioned in the trial court's ruling, the record does not support petitioner's contention that the trial court failed to consider his youth when determining that he acted as a major participant in the offense and with reckless indifference to human life. Rather, the record suggests the court considered, but rejected, petitioner's arguments and evidence regarding the impact of youth on his ability to form the requisite state of mind. As the trier of fact, the trial court was free to determine the weight to be afforded to petitioner's evidence, and to reject his arguments in light of other compelling evidence regarding petitioner's state of mind.

Furthermore, evidence regarding petitioner's youth does not undermine the sufficiency of the evidence supporting the trial court's findings. The court expressly found that petitioner knew there was a grave risk of death to Martinez when he returned to the occupied residence with a firearm and initiated the events that led to the murder by throwing a brick through the window. Additionally, although Blak opined generally that petitioner, at the time of the offense, was "unable to engage in thoughtful, rational modulation of his acts and behavior," he did not opine that petitioner was unable to appreciate the risk of death associated with his conduct. Rather, Blak opined that petitioner's conduct was "consistent with an individual who is not fully convinced that engaging in the behavior was appropriate, prudent, or advisable."

We also note that the record lacks evidence that petitioner's youth made him especially vulnerable to peer pressure or rash impulse. Indeed, the facts, as relayed by petitioner to Guzman are to the contrary. Petitioner went to Martinez's home three separate times on the night of the murder. He twice jumped the fence into Martinez's

21.

yard while others in his group stayed behind. He handled the weapon while encouraging Vargas to throw a brick through the window. Ultimately, he returned the weapon to Vargas and threw the brick himself. These facts do not suggest petitioner was swept along by the vagaries of others' behavior or his own rash immaturity. Petitioner's behavior throughout the incident was sufficient to support a finding that he acted with reckless indifference to human life, notwithstanding his age at the time of the offense.

## DISPOSITION

The order is affirmed.

DETJEN, J.

WE CONCUR:

LEVY, Acting P. J.

FRANSON, J.

22.